UNITED STATES v. HOWELL et al.

(District Court, W. D. Missouri, St. Joseph Division. December 21, 1892.)

No. 15,243.

1. CONSPIRACY—VIOLATION OF INTERSTATE COMMERCE ACT—INDICTMENT.

Where an indictment, under Rev, St. § 5440, for a conspiracy to commit an offense against the United States, namely, the offense created by section 10 of the interstate commerce law, as amended by the act of March 2, 1889, (25 Stat. 858,) charges a conspiracy between certain lumber merchants and their servants and an employe of a railroad company to procure less than the established rates by false weighing of the lumber shipped, such weighing being done by the railroad employe, the jury, in order to convict, must find an agreement or combination between two or more of the defendants for the purpose named, and also, as an overt act, the actual false weighing of lumber by such employe.

2. SAME—OVERT ACTS—SINGLE OFFENSE.
   Where the evidence shows one continuous agreement or intention to secure such underrate, proof of a single overt act in furtherance of it is sufficient to make out the offense; and proof of separate overt acts will not show more than one offense where the agreement or combination is one and continuous.

3. SAME—EVIDENCE—VARIANCE.
   The indictment charged that the shipment was made from East Atchison, Mo., where the underweighing was accomplished, to points in Nebraska and Colorado. The evidence showed that the lumber was shipped from Atchison, Kan., and it was also shown that the rates from Atchison and East Atchison were the same. *Held*, that this variance was immaterial, if the overt act charged—the underweighing—was accomplished at East Atchison, within the jurisdiction of the district court trying the indictment.

4. SAME—ESTABLISHMENT OF RATE—POSTING SCHEDULES.
   The posting of schedules required by the interstate commerce act is solely for the information of the public, and is not necessary to the establishment of the rate; and hence, where a rate is known to the persons operating the railroad as a fixed rate, having a uniform character, and undertaking to treat all shippers alike in proportion to the distances shipped, then such rate is established, within the meaning of the section under which the indictment was found.

5. SAME—EVIDENCE.
   As evidence of the establishment of the rate, the jury may consider the testimony of those employes of the carrier having charge of that branch of its business, and also the fact that it posted a notice stating that schedules of rates could be inspected upon application to its agent.

6. SAME—INDICTMENT—MATERIAL ALLEGATIONS.
   The allegation in the indictment that the railroad employe therein named was employed by the railroad to weigh the lumber shipped is material, so far as concerns the overt acts of underweighing therein charged, but it is immaterial whether he was generally employed for the purpose.

7. SAME—UNLAWFUL ACTS OF AGENTS.
   The shippers of the lumber may be convicted under this indictment upon a showing that their servants procured the unlawful discrimination in rates as therein charged, provided they knew of such unlawful acts, permitted them to continue, and received, directly or indirectly, the benefit of them; for it was their duty to see that the law was not violated by their subordinates by reason of their own negligence.

8. SAME—EVIDENCE—RESIDENCE OF PARTIES.
   In order to the conviction of parties charged with conspiracy it is not essential that they should have resided within the jurisdiction of the court trying the indictment at the time the conspiracy was formed, if the conspiracy was entered into, and had its headquarters, in that jurisdiction.

9. SAME—CIRCUMSTANTIAL EVIDENCE.
   The formation and existence of the agreement or combination charged may be shown by circumstantial evidence, and the overt act proved may be considered as one of the circumstances tending to show it.

10. SAME—ACCOMPLICES.
    It is not necessary that the testimony of an accomplice in the conspiracy charged be corroborated in every part of the act which goes to make up the offense, but it is sufficient that he be corroborated in some material fact.

At Law. Trial of an indictment under Rev. St. § 5440, against George W. Howell, Herbert N. Jewett, and S. R. Howell, shippers, Ed. Tibbetts and Edward F. Pierce, their servants or agents, and W. D. Mott, an employe of the Chicago, Rock Island & Pacific Railway Company and the Chicago, Kansas & Nebraska Railway Com-

pany, for conspiring to violate the interstate commerce act by false billing, false weighing, and false reports of weight of lumber, and thus obtain a discrimination of rates of transportation. The fraudulent weighing and billing were alleged to have been done by the defendant Mott, by procurement of the defendants Tibbetts and Pierce, acting for the other defendants.

Geo. A. Neal, U. S. Atty.

W. R. Smith and Hall & Pike, for defendants.

PARKER, District Judge, (charging jury.) You have heard the evidence in this case, and the arguments of counsel upon the case. It now becomes the duty of the court to give you the principles of law to apply to that state of the case which you find to be true from the testimony. You are aware that your verdict, as does the verdict of every other jury, consists of two things,—the truth as you find it, and the principles of law applicable to that truth. In that way you get at the result which we call a "verdict." The principle of law given you is that which defines the crime, aside from other principles given by the court, instructing you as to how you should view the evidence of witnesses, and some other subordinate matters of that kind. The definition of a crime is that which the law declares to be the offense, and to which you are to take and apply the evidence to see whether the evidence makes out such a state of case as the law says shall be established to make the crime. Now, this is not a charge for the actual commission of an overt crime, but is only a charge where it is alleged the parties agreed to commit a crime called in law a "conspiracy." It is laid down under the law as it now stands, by section 5440, Rev. St., as amended by the act of congress, as follows:

"If two or more persons conspire, either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than $1,000 and not more than $10,000, and to imprisonment not more than two years."

You are aware of the fact that under the law of the United States you do not fix the punishment, but you pass upon the question of the guilt or innocence of the party charged. This is the statute under which this offense is charged. There are other statutes that have been passed, comprehended in what is usually called the "Interstate Commerce Act," together with the several amendments that have been passed since that time. It is by this act that the overt act—that is, the open act; the actual act done in furtherance of the conspiracy or to effect the object of the conspiracy —is alleged to be a crime. It was first made an offense under that act for common carriers of property for hire to do certain things which are set out in the section of the law as amended by the act of congress of March 2, 1889. It is provided there that any common carrier subject to the provisions of this act, or, whenever such common carrier is a corporation, any officer or agent thereof,

or any person acting for or employed by such corporation, who, by means of false billing, false classification, false weighing, or false report of weight, or by any other device or means, shall knowingly and willfully assist, or shall willingly suffer or permit, any person or persons to obtain transportation for property at less than the regular rates, then established and enforced on the line of transportation of such common carriers, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any court of the United States of competent jurisdiction within the district where such offense was committed, be subject to a fine not exceeding $5,-000, or imprisonment in the penitentiary for a term not exceeding two years, or both, in the discretion of the court, for each offense.

That is the section of the law which has reference to the common carrier. There was no provision under this act that undertook to declare it a penal offense for the shipper to do certain things. There was no penalty that was applicable to the act of the shipper until the amendment of this law, March 2, 1889. On its first enactment it was manifest to the lawmakers that the railroad companies alone were the parties who would make this unjust discrimination against the people of the country, against the consumer, against the man of small business, against the man who is selling in small quantities, against the man who is willing to assist his neighbor by setting up that generous rivalry in trade that promotes the welfare of the consumer. It was not conceived by the lawmaker who would be the principal party in interest that would be benefited by this discrimination. But the great shipper, the large wholesale dealer, the man running the combine, or the trust or the combination entered into by vast enterprises, would be the one that would seek and was promoting this discrimination in the freight rates of the country when this last law was passed. It was accordingly seen that that would be the purpose of parties so interested. It was therefore declared by the amendment passed on the 2d day of March, 1889, that for certain conduct upon the part of shippers a penalty should be prescribed. The law is as follows:

"Any person, and any officer or agent of any corporation or company, who shall deliver property for transportation to any common carrier subject to the provisions of this act, or for whom, as consignor or consignee, any such carrier shall transport property, who shall knowingly and willfully, by false billing, false classification, false weighing, false representation of the contents of the package, or false report of weight, or by any other device or means, whether with or without the consent or connivance of the carrier, its agent or agents, obtain transportation for such property at less than the regular rates then established and enforced on the line of transportation, shall be deemed guilty of a fraud, which is hereby declared to be a misdemeanor, and shall, upon conviction thereof in any court of the United States of competent jurisdiction within the district in which such offense was committed, be subject to a fine of not exceeding five thousand dollars, or imprisonment in the penitentiary for a term not exceeding two years, or both, in the discretion of the court."

Now, that enumerates the different methods that may be used by the carrier for the purpose of carrying on this discrimination, and it contains a general sweeping clause providing that all other devices

or means, such as by reporting falsely to the carrier the contents of the package, and in that way getting a discrimination, or by any other means or contrivance or device, if he seeks to obtain this discrimination for his own benefit, he is liable to a penalty. You and I are to take a view of all the facts and circumstances, and are to enforce the law if it has been violated. If a law is a bad law, it should be enforced in order that it may be the sooner known and repealed, and, if it is a good law, it should be enforced in order that justice may be done. We have nothing to do with the good or bad policy of the law. The question, and the only question, that we are to inquire into, is to first ascertain what the law is, and then whether it has been violated; and we sometimes are enabled to take a more comprehensive and proper view of the state of case by understanding the good or bad policy of the law. Now, it seems to me at a glance that the good policy of this law is apparent, and especially of this provision prohibiting the conduct of the shipper, who is more largely interested in getting reduced rates than any one else— Gentlemen, the shipper, and especially the large shipper, has a great interest to induce him to get a discrimination of rates in his favor,—to get an "underrate," as it is called; and the man who gets a discrimination in his favor in the shipment of his freight, especially if he is doing a large business, seeks thereby a large personal benefit to the detriment of his rival in a small business, and by the same process works an injury to business all over the country, whether he be a lumberman, a wholesale groceryman, or a large shipper.

How can he do that? In the first place, by means of this discrimination he is able to overcome all rivals, and press out smaller business not as well situated in that respect as he is; and not only the rival wholesale dealer, but he is so situated as to be able to do as the proof shows these defendants did. He is able to have branch retail houses all over the country, and operate a business of that kind, caused by the discrimination in his favor. It is therefore agreed that the purpose of this law was to protect the people. That was the intention of it. There was great wisdom in providing that, if there was a discrimination to be made by this means, there should be a penalty attached to such conduct. These are the two provisions of the law that create an offense of the character I have named upon the part of the common carrier or his agent, and also conduct of a like character, or conduct that may be similar, to some extent, upon the part of the shipper. The shipper may commit the offense with or without the concurrence of the other party.

It is alleged in this indictment, in connection with other things, that the purpose of this conspiracy was to enable S. R. Howell, George W. Howell, and Herbert N. Jewett to obtain this discrimination of rates or to obtain rates less than the regular rates charged by this railroad company, specified in the indictment. That was the purpose of the conspiracy. Remember, you are not trying them for doing that, but for conspiring to do that. You are required to find that Mott, who is alleged to be the man who did the overt

act,—and he could do it with the concurrence of anybody, or without the concurrence of anybody,—that he did certain things in furtherance of this design. The law requiring that some one of the conspirators shall have done some overt act—some actual act— to carry out the common design and the common criminal enterprise, the act so done by some one of the conspirators must be a crime under the law of the United States. Now, under this section two things are required to make this an offense: First, there must be a conspiracy as affecting these parties, or at least two of them, and, in furtherance of that conspiracy, the man Mott must have done that which it is alleged he did do in furtherance of this conspiracy, and the proof offered must show it accomplished,—the purpose enumerated in the indictment.

I will now tell you what is necessary to be found in this indictment. Now, there are different kinds of allegations in the indictment. There are those which go to the very gravamen of the offense, and others that are material, but subordinate. They do not occupy that importance in the indictment that others may occupy, yet they are all necessary to make the offense. Let us see what is charged in this indictment, and ascertain what is necessary to be proven; and after that we will define this crime known as a "conspiracy;" and after that we will enumerate to you what must be shown to have been done by Mott in furtherance of that conspiracy; then we will give you the rules of law that are to be considered by you in weighing the testimony of the witnesses.

You will understand that if you should believe that these different shipments, charged in this indictment,—and there are only two sets of shipments, by the way, although they were charged in four counts,—if these shipments were all made in pursuance of the common agreement, one agreement, (you will bear in mind that a conspiracy may be continuous,) then they are acts done in furtherance of the one agreement. Your recollection will not fail you when you refer to the condition of things at the time of the whisky frauds in this country, and the proof showed them to have been continuous for years; men were connected with them for years. Now, in this case, if there was a common criminal understanding entered into, and I mean by that a conspiracy to do the offense charged in this indictment, and all that is alleged in the indictment to have been done was done in pursuance of that one agreement, then there is but one offense in all these charges and the overt acts or the actual acts done causing the conspiracy. It is for the agreement to do the acts you are to first make search. And I repeat, in order that you may make no mistake, that if there was an agreement, and acts were continually done as are charged in the different counts of this indictment, then there is but one offense. There are four counts. They do not undertake to charge but one offense; that is, provided you find there was but one conspiracy. If you find that to be the case, then the effect of these four counts is only to charge one crime. Although there may have been many different sets of overt acts done in furtherance of this conspiracy,

the proof of one overt act is enough for you to find to establish that branch of the case.

It is not necessary to find both of the others charged in the indictment. The doing of one overt act by at least one of the conspirators is sufficient to make out that element of the offense, if done in furtherance of it. Both of the overt acts do not make it any the less a conspiracy. Now, the first count in this indictment charges the shipper of certain lumber with doing certain things; and I want to say to you that all these counts run together. The first and third are the same, with the exception of the allegation of the relation of these defendants to each other. The second count alleges that S. R. Howell and George W. Howell and Herbert N. Jewett were partners. The third count alleges that S. R. Howell and Herbert N. Jewett were partners, and that George W. Howell was their agent, together with Pierce & Tibbetts.

The crime as charged in the third count has the same relation to the transaction or to the business. It includes Pierce, the witness here, and the defendant Tibbetts; that is, the charge in the third count. Now, if you should believe that that was the relation of the parties, and that they were not partners, as charged in the first count, then your finding would be properly made under the third count in the indictment. The same offense is charged, the same conspiracy to accomplish the same purpose, and the same overt act is set out, in the third as in the first count of the indictment. Now, again, the second count charges the same conspiracy as the first count. Provided you find there was no break in the agreement, you then find there was but one unlawful act. It charges the same conspiracy. It charges, also, that S. R. Howell, George W. Howell, and Herbert N. Jewett were partners, as does the first count, but it charges the doing of a different overt act. The shipping to the different·destinations of the cars and the amount of lumber shipped, and that it was of different weight from the lumber described in the first count, and that the underweighing was in greater proportion than in the first count,—that is the difference between that count and the first count,—I say it depends upon whether you find there was any break in the criminal understanding or agreement. The proof shows, as I am compelled to remind you, gentlemen, a continuous transaction of this character, that it was a continuous business, and you would have a right to consider the continuing nature of the business to ascertain that there was but one conspiracy. Now, the mate of the second count is the fourth count. It charges the same overt act. It charges the same character of conspiracy, or to accomplish the same results. I mean it charges the weighing of the same amount of lumber in pounds and the same destination for the lumber, but, like the third count, it alleges a different relation of these defendants to each other. It sets out, as does the third count, that S. R. Howell and Herbert N. Jewett were partners, and George W. Howell was their agent, as in the third count, and that he occupied the relation to the transaction as did Pierce and Tibbetts. That is the only difference between

that count and the second count in the indictment. If you should find that that overt act was one done in the same way as the one that is alleged to have been done under the third count in the indictment, your proper finding would be: "We, the jury, find the defendants S. R. Howell and H. N. Jewett guilty as charged in the fourth count. of the indictment." If you find they were all partners under the first count of the indictment, then the proper finding would be upon the first and second counts of the indictment. Now, let us see what is necessary to be found. I have called your attention to the fact as to the different relations of these parties that are set up. It is alleged in addition that Edward Pierce and Edward Tibbetts were engaged by said parties or said company as agents in and about the shipment of lumber. That is necessary to be found,—that they were the agents,—because in ascertaining the extent of this 'conspiracy it is your duty to gather in all the parties connected with it. It becomes 'twofold your duty in a case like this, because you will understand that it takes at least two persons to make a conspiracy. You may find a party guilty, provided he acted with others, not even indicted, so as to make the two in the conspiracy.

Then you will remember that the principle as indirectly invoked, that those two witnesses, Mott and Pierce, occupy the relation before you as accomplices; that is to say, they confess or admit they were accomplices. You are to consider their relation to the case, before you can consider it. You must believe their relation as accomplices, and to believe they were accomplices you must find a condition in which. as accomplices they acted in this conspiracy, because, if you do not, you cannot find the condition of an accomplice. But they confess by their evidence that they were accomplices. Therefore it becomes necessary that you should gather up in your minds the condition as shown by the testimony, and in' this way judge whether that relation or not existed. In addition you are required to find that the Chicago, Rock Island & Pacific Railroad Company and the Chicago, Kansas & Nebraska Railroad Company were companies—railroad companies—engaged in the business of common carriers shipping for hire, and, in addition to that, it is necessary to find they occupied such a relation under the law as that the law applies to their shipments, because, as remarked by counsel on the part of the defendants in this case, this law has nothing to do with shipments in the state. It must be interstate shipments to give congress power to pass such a law, and punish under such a law.

And the proof is sufficient, as the court has told you, if they were acting as de facto corporations, and engaged in this matter of common carriers from one state in the United States to another, and in this case we think as to this commodity, this merchandise or lumber, if you please, was shipped from one state to another. The court in that connection yesterday intimated that in its judgment the allegation in the indictment that this lumber was delivered to these parties at Atchison, Kan., for shipment in Kansas, the rate

being the same from Atchison as from East Atchison or Winthrop, and the condition as to its being interstate commerce being the same, —that allegation in the indictment as to shipment from points in Kansas,—becomes a subordinate allegation, and the variance between the allegations and the proof was not material, because it cannot possibly work any substantial injury to the defendants. The material inquiry on that point is whether this overt act was done and this conspiracy was entered into in this jurisdiction, and consequently whether these elements of this crime transpired in this jurisdiction; and, again, whether or not the lumber, as a matter of fact, was shipped through this jurisdiction or from the state of Kansas to some other state in the Union, and that it passed into this jurisdiction and was weighed in the jurisdiction. That is, the overt act that goes to make out that requisite of the crime, provided it was underweighed.

These things are required to be found, and then it is required to be found that they undertook to ship this lumber to the towns named in the indictment, or to some one of them, either to Deshler, Neb., Du Bois, Neb., or Lewiston, in the state of Nebraska, or to the towns of Arriba and Burlington, in the state of Colorado. The court tells you in this connection that the proof shows such a relation upon the part of this railroad company to this transaction as to show that it becomes subject to the law of congress,—the law passed in 1887, and amended in 1889. You first are required to find, in addition to these propositions, that the said corporations, the ones which I have named, and that are set out in the indictment by the name of the Chicago, Rock Island & Pacific Railroad Company, the Chicago, Kansas & Nebraska Railroad Company, and the St. Joseph & Iowa Railway Company, had established schedules or tariffs of transportation for persons and property along the lines of transportation of such common carriers. If a rate had been established, if it was known by the people in charge of these railroads as an established rate, as a fixed rate, having a uniform character, undertaking to treat all shippers alike in proportion to the distances shipped, if that rate was then and there a fixed rate of that character, in my judgment it is not necessary that it should be published by posting the rate up. That is a thing required by this law to be done by the railroad company for the information of the people, that this practice may not be indulged in by the shippers, and any companies may not discriminate in favor of one and against others, and, if these companies did not do that, there is a penalty attached to it; but that is a different duty from the one prescribed by this statute. If they have an established rate, if that rate is established, if it is so far established as to become a fixed rate under which they act, and parties as shippers, or parties as agents of common carriers, combined for the purpose of evading that rate, of getting an underrate in their favor, or of securing a discrimination as against the people generally, they may be held under this law which charges them with conspiring to do an unlawful act. You are required, of course,

to find that a rate has been established by the railroad company. You may take into consideration, in ascertaining the establishment of that rate, the testimony of the witness or witnesses who had charge of that sort of business, and you may also take into consideration the poster put up by them to inform the public as to where these rates could be seen. It is the evidence of the established rate upon their part, and that is one of the elements that must be found in this case. Now, you are required, in addition to that, to find that at the time alleged in the indictment, which was upon the 28th day of May, 1889, or within three years prior to November 6, 1891, the date upon which the indictment was found, Mr. Mott—W. D. Mott—was a person acting for or employed by said railroad companies in weighing and reporting weights of all freights taken and received by them for transportation by said corporations at the city of Winthrop or East Atchison.

That is material to be shown, or so much of it as that he was employed to make the weighing alleged to have been made in the indictment. Whether he was generally employed for that purpose does not matter. If he was employed for the purpose of making these weights, where there was an underbilling, where there was an underweighing, where there was an attempt to secure a discrimination in favor of the shipper, that would be responsive to that allegation. If he was working for this weighing company, and these railroad corporations were members of that company, he would be their agent. That is necessary to be found. In addition, you are required to find that as far as the first count is concerned, and I have given you the difference between these counts and the one difference that exists— I am talking now as to what is necessary to be found under the first count, and the same thing must be found under the other counts, varying according to the difference in the overt acts charged, and the difference existing in the relation of these parties to each other. The first count has charged that S. R. Howell, George W. Howell, and Herbert N. Jewett were doing business as partners. Then you are required to find that that relation existed between them; that they occupied that relation to each other; and that in attempting and designing to ship large amounts of lumber from Winthrop to points in other states, to wit, to Deshler, in Nebraska, to Du Bois and Lewiston, Neb., and Arriba and Burlington, in the state of Colorado, to some one of these points in Nebraska or Colorado that are named in this indictment, they were there representing the shipper; that these parties, Pierce and the other defendants, were the agents of these parties when they were intending to make these shipments, and that they were acting for said parties as their agents, and acting in this transaction with the knowledge and procurement of S. R. Howell, George W. Howell, and Herbert N. Jewett,—because it is necessary to show the relation of the Howells in this transaction if they are to be convicted. If this business was the business of the Howells, or, if you please, it was the business of George W. Howell and Herbert N. Jewett, and that Pierce and

Tibbetts, or Pierce and Tibbetts and George W. Howell, as charged in the third and fourth counts of the indictment, did things that are charged that they did do, in furtherance of the common design to connect these other parties, the parties who owned the business, the heads of the firm, as it were, the business must be done with their knowledge and procurement. If they knew about it, and they permitted it to go on and received the benefits from it, they are directly or indirectly interested in it. It matters not, in this case, whether the benefit was directly received by the consignee or the consignor of this lumber or by the shipper. It makes no difference.

If the purchaser receives the benefit of the transmission of this lumber, then it was a direct benefit to him, and also a direct benefit to the man who was the seller, because by means of cheaper rates, of under prices, he makes customers and builds up trade, and by means of trade holds out inducements to men to purchase from him because of the advantage he has with the railroad company. So, in every case it is either a direct or an indirect advantage to him. If the man who is the buyer pays the freight, as a natural consequence he will buy more goods from such a firm than if it were a house that could not control these freight rates. That is one of the reasons why such a law was enacted, that one man in business should not create such a trust or combination or monopoly as would destroy the trade and commerce of the country if it was regulated by his dictation and by his control. It is in pursuance of this, in pursuance of the trade and policy of such men, legislation is leveled at the heads of these men, these combinations, these trusts, that are reaching out and grasping all the concerns of this country, so that the consumer and small dealer and everybody else has to pay toll to the combinations or to the large dealers. Then it makes no difference, I say, whether the benefit to the shipper was direct or indirect, or to the owner of that business in this case,—either the two Howells and Jewett, or S. R. Howell and Jewett,—the transactions carried on by Pierce and Tibbetts must have been done with their knowledge and procurement.

If they had the knowledge of it, if they permitted it to go on, if they received benefits from it, directly or indirectly, it was by their procurement as much as though they had directly or indirectly commanded it to be done, because it is the duty of a business man so situated to see to it that the law shall not be violated by his subordinates through his neglect of his duty to attend to his business and to protect the public. If you find that the proof does not show the connection to that degree of certainty that the case must be proven that S. R. Howell was so connected with this transaction, that is, that he either knew of it and commanded it, or that he had knowledge of its being done and permitted it to be done, and that the firm received the benefits of it, he would be entitled to an acquittal at your hands, unless the evidence shows his relation to that transaction, as I have stated, beyond

a reasonable doubt, as it must show it before you can find him guilty. Now, while these parties occupied this relation to each other, some as owners of the business and shippers, and some as agents of the shippers, and another as agent of the railroad company, and the party who did the weighing while they were occupying that relation, you are required to find that all these parties conspired with one another to commit an offense against the United States,—that is to say, that they did, on the day mentioned, or at any time within three years prior to the 6th of November, 1891, conspire, combine, and agree together falsely and fraudulently to ship a quantity of lumber at less than the actual weight, and they were then within this jurisdiction, that is, the St. Joseph division of the western district of Missouri,—and also to find the one charged with doing the overt act, as alleged, did, by false billing, false weighing, and false representations of weights, knowingly and willfully assist, obtain, suffer, and permit the said George W. Howell, S. R. Howell, and H. N. Jewett, of said company of Howell, Jewett & Co., to obtain transportation for their said property. In this case the proof must show you the combination and means resorted to in furtherance of it and the purpose for which they entered into it, to wit, to enable this firm of the Howells and Jewett or of Howell and Jewett, as the case may be, to obtain transportation for their property,—that is, lumber alleged to have been transported and underbilled,—to obtain from them that privilege to secure the carriage of the lumber to the points designated, and from the place where it was billed and weighed, at less than the regular rates then and there established and in force. That is the allegation of the conspiracy; that is the allegation of the purpose in view when they did conspire. There is but one other clause in this indictment, and that is that while that was the purpose of these parties, while that was their object, W. D. Mott, in furtherance of the common design of which he was a part, of which they were all alleged to have been a part,—the common design which bound them together for the purpose of obtaining the shipments at underweights,—that in furtherance of that design to accomplish it he did a certain thing. What is it? That he weighed a car or cars of lumber and shipped them out at less than their actual weight; that is, by falsely weighing, falsely billing freight to be shipped. That is the allegation of the act done by Mr. Mott in furtherance of this common design; that is what is necessary to be found in this indictment; and it must be found, if you find under any of the counts in this indictment.

Now, what is the nature of this charge of conspiracy? Mr. Justice Dillon, in his trial of the whisky cases, gives a very happy definition of this crime called a "conspiracy." He says: "A conspiracy means a combination formed by two or more persons to effect an unlawful end; said persons acting under a common purpose to accomplish the end desired." U. S. v. Babcock, 3 Dill. 586. An agreement or an undertaking, or a combination, if you please, entered into

between two or more persons to accomplish an illegal result, and what is meant by accomplishing an illegal result is doing something which is against the laws of the country; entering into a combination to do anything of that kind; to do something which by law is a crime. Two men may agree to go out here and steal a horse. That is an offense against the laws of the United States, provided it occurs in a place where the United States has jurisdiction, as in the Indian Territory. They agree to go out and steal a horse. They do not steal the horse, but one of them goes to the stable and gets a bridle, that they may safely get away with the horse. They are intercepted. They did not steal the horse at all. Now, they may be indicted for attempting to steal the horse, in entering into a conspiracy to steal the horse, but they cannot be convicted for the offense of stealing, even if one of them went so far as to do an overt act in furtherance of the design. Not only this unlawful combination shall be entered into, this agreement to violate a law of the United States, but one of the parties to the conspiracy must do the overt act charged, that we can see there is something more than a mental purpose to commit the crime. These are the two things that make up this crime: The overt act I have enumerated to you; such act alleged in this indictment to have been done by Mott; the act that was agreed upon to have been done by these other parties in furtherance of this conspiracy. The agreement upon the part of the alleged conspirators was to secure a shipment of freight at an underweight as established by the railroad that did the shipping. That was the purpose of the combination, and if it was accomplished in the manner enumerated by the statute, if he did that which would make him responsible under the paragraph of the law as to the shippers, who would become responsible under that act for the crime committed by him, he might become guilty under the law. Now, these are the two elements that go to make out this crime. The doing of the overt act in furtherance of the common criminal design is one of the things you must find. You are required to find, first, in this case, was there such a conspiracy, as is alleged, as affecting at least two of these persons? It is not necessary that the two should be on trial. Was there such a conspiracy as is described in this indictment, and was any one of these overt acts that are alleged here to have been done in furtherance of it done as alleged? These are the propositions necessary to be found to establish this case, such as is stated in this indictment. After you have found these propositions,—that is, whether they are true or not,—then you are to look into this evidence to see how many defendants were connected with this unlawful combination. Now, what is necessary to make a conspiracy? You will understand that this is a crime that may be committed at long range. A man may be living in Chicago and be guilty of a conspiracy in this district. In the whisky trials it was alleged that men living in the city of Washington were so connected in the conspiracy in the eastern district of Missouri as that they could

v.56F.no.1—3

be tried in that district; and it is true that a man may be connected with this kind of a crime, and be responsible for it in a given jurisdiction where it has its headquarters, where the agreement is made out, where it is entered into; he may be connected with it as though he had been living in that jurisdiction. In this case it is not necessary for S. R. Howell to have been living in the jurisdiction at the time of the formation of the conspiracy. He may become a party when it was created, by acts of a certain nature, even though living in Chicago, or he may be responsible after it was formed, provided he went into it or had anything to do, as charged in the indictment.

Does the law require you, under your oath as jurymen, to see the thing itself in order that it may be found to exist? It gives you the right of judging the intent from the act done. You cannot find it except in one way, and that is by circumstances. Especially is that true with a conspiracy. The conspirator has two objects in view. He would hardly think it worth while to enter into a conspiracy unless there was some motive which prompted the desire to consummate it. Because he has that motive to consummate it, it is necessary to have a secret understanding. People do not put it in writing, as you do a deed which conveys your land to another, or have it recorded in a book as evidence of the title that you pass to another. If the officers of the law would lay their hands upon them before they had consummated the conspiracy, their purpose would fail; then they may act with secrecy because of the desire to accomplish a result. It is not necessary to be made by so many formulated words. I know that not one of you gentlemen has a criminal purpose in view, but I have explained this for the purpose of showing to you the principle, and in construing it you must be guided by the light of human experience and human understanding; but if I knew that one of you gentlemen had a criminal purpose in view, and with that knowledge I joined you for the purpose of consummating that object, and in furtherance thereof I entered upon the same design with the purpose of aiding you in its commission, then it is the same, for I have joined the conspiracy as though I had been a party to it in the beginning, for that is what the law seeks and calls a "design" or an "agreement" entered into with the knowledge of assisting in the perpetration of that which is against the law, and which is called a "conspiracy." It may be entered into in either one of these ways. If it is a secret, how are you to find it? I may read a little in reference to the nature of conspiracy. Judge Dillon says, in the case of U. S. v. Babcock, 3 Dill. 585:

"It is not neccessary, to constitute a conspiracy, that two or more persons should meet together and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the details of the plans or means by which the unlawful combination was to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and un-

lawful design. In other words, where an unlawful end is sought to be effected, and two or more persons, actuated by the common purpose of accomplishing that end, work together in any way in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part he was to take therein was a subordinate one, or was to be executed at a remote distance from the other conspirators."

Any act done in shipping this lumber to its final destination out of the district, if done by all or any one of these parties, would be an overt act, you can notice, if done in the jurisdiction. A combination formed by two or more persons to effect an unlawful end is a conspiracy, said persons acting under a common purpose to accomplish the end designed. Any one who, after a conspiracy is formed, and who knows of its existence, joins therein, becomes as much a party thereto from that time as if he had originally entered into it. That is the nature of this crime. How are we to find it? We must find it, if we are to find it at all, alone by circumstances, because we cannot find it by positive evidence. Positive evidence may be introduced to show the existence, as in this case, of the overt act, done in furtherance of the conspiracy. We can have positive proof of it, and this witness who did the weighing would be a positive eyewitness. Pierce or any other witness would be a positive witness. That is something which is tangible and real, and something to which you can apply one of the five senses. It is not necessary to prove that underbilling was done in secret, although it matters not whether it was so done so far as that part of the offense is concerned. As to the overt act, you have positive evidence of its occurrence, and you may resort to this class of testimony called "positive evidence," because proved by an eyewitness of the underbilling. There is another kind of testimony that you can resort to, and, while men sometimes have a prejudice against this class of evidence, Judge Dillon said, in a case he tried while he was on the circuit bench of Iowa, that although this was one of the resorts of lawyers to make a hobgoblin, to frighten jurymen into a prejudice against this class of evidence, yet circumstantial evidence was one of the most important classes of testimony. Although we know there are men who have some prejudice against this class of testimony, when we understand it and look at it fairly we can see how much depends upon this kind of evidence. A man enters the household of an innocent family and murders the wife and the children of the husband. No eyewitnesses except those eyes that are closed by the hand of death were eyewitnesses. What are you going to do? Are you going to let it stand unpunished? Shall we say, because there was no eyewitness of the crime, that the murderer shall go unpunished, because no one saw the shooting, the flash of the pistol, or the dagger used? That man who did it may be insane. He may be incapable of having intent. Under the law, in a crime of that character, even as in crimes of a high nature, the intent is the first element that goes to make up the crime. Under the law, until you prove the intent to commit the crime, no conspiracy can be charged. How are you going to prove it?

You cannot prove it except by circumstances. There has not been an eyewitness who could see the mind of that man actually and really. It is only by circumstances, and acts connected with the circumstances, that we are able to form any opinion. Now, of all the crimes that have to be proven by circumstantial evidence, this is the chiefest, because of its secret character, because of its not being proclaimed or made public, so that men can see and know it by the positive evidence. You have to drag it to the light of day to see whether there was an intent or a purpose to commit a crime or a criminal design, for the intent or design is the very germ of the crime. I do not consider it improper to detain you a little longer to give you the opinion of one of our ablest jurists on this class of testimony, which is often resorted to by courts. In the case of Com. v. Twitchell, 1 Brewst. 571, a case tried in Philadelphia before Judge Brewster, the court in that case says, and I indorse every word of it:

"Mr. Bentham tells us that all evidence flows from persons and things. These are the only two sources from which we can expect testimony, and, unless we resolve to let all secret crimes go unpunished, all civil disputes to remain undecided, and to throw away our reason, we cannot act upon the statements of persons and things. I say statements of things, because if we consult the experience of every hour we will be taught that inanimate objects have voice as well as sentient things. It is in vain, then, for man to say that, because others have failed in their efforts to detect error, he will sit quietly down, and perversely refuse to apply his intelligence to the problems of life, whether they encounter him in the counting room or in the jury box. He might just as well refuse to use his legs because others have fallen or been killed in walking. He might with equal propriety refuse to eat because others have been poisoned while partaking of nourishment. Some persons, admitting the force of the principle which actually compels us to act upon evidence, still insist nothing but positive testimony should produce conviction, and, adhering tenaciously to this favorite dogma,—those who are too timid or too weak to exercise the reasoning faculties with which kind Providence has endowed them,—they assail all circumstantial evidence. A moment's reflection, however, must satisfy all candid minds of the unsoundness of such a proposition. Suppose for a moment that this was the rule for our being, and that we had been so constituted that we could believe nothing unless it was demonstrated to us by our own senses or by the statement of an eyewitness, what would then be our condition? Of course, we could not punish any crime unless it were perpetrated in the presence of spectators. All secret murders, arson, burglaries, forgeries, and other offenses could be committed with impunity. Nor would the mischief stop there. Few civil controversies could be settled by juries, no book of original entries could be received in evidence, no note or obligation would avail unless there were a subscribing witness; indeed, this would not be sufficient, for, if he died before trial, the claim would expire with him, and insurance on the life of the witness would not even avoid the difficulty, for the policy would die with its attesting witness. For the same reason all receipts would perish with those who saw them signed, and all our deeds and muniments of title would be swept away by the death of the subscribing witness and the magistrates before whom they were acknowledged; all proof of handwriting by comparison be annihilated; commerce would be destroyed, or remitted to its infancy in barbarous ages. With the abolition of legal punishment for crime, mob laws and vigilance committees would supersede the use of courts and juries. The whole framework of society would be impaired, if not destroyed. The absurdity of the prejudice against circumstantial evidence may be still further illustrated by reflecting for a moment upon the use to which we constantly and properly apply it. Not only do business men an-

swer letters, pay drafts, and credit others to the extent of millions daily upon the testimony of circumstances alone, but they commendably carry this faith, as the evidence of things unseen, into the reasoning which connects them with the world beyond our own. A trifling circumstance—the fall of an apple--has proved to the satisfaction of philosophers the great laws of gravitation which control the motion of the universe. The man who denies the existence of his Maker is properly regarded by many as thereby evincing his want of reason. Yet what proof have we of this important and accepted truth except from circumstances? The same kind of testimony is the prop of our belief in all the great truths of revelation. If we turn from the world to the great mechanism within us, we see again that no rational man pauses for one instant to doubt the force of circumstantial testimony. What evidence have we that it is a heart that beats or a brain that throbs within us, except from the fact that those organs exist in all similarly constituted beings? And we accept remedies for all the ills that flesh is heir to upon precisely the same faith as circumstantial evidence."

Chief Justice Gibson has given an excellent illustration of the force of this kind of testimony. He says, (Com. v. Harman, 4 Pa. St. 272:)

"You see a man discharge a gun at another. You see the flash, you hear the report, you see the person fall a lifeless corpse, and you infer from all these circumstances that there was a ball discharged from the gun, which entered his body and caused his death, because such is the usual and material and natural cause of such an effect. But you did not see the ball leave the gun, pass through the air, and enter the body, and your testimony to the fact of killing is thereby inferential; in other words, circumstantial."

The improvements of modern science furnish us with another illustration: You are in a telegraph office, and see the battery in motion. A message is received. The station at the other end of the line may be a thousand miles distant. No human eye ever saw the subtle fluid pass along the wire, and yet you would hardly listen with patience to the man or the argument undertaken to reason to you that the message might have come through the air or the earth without the agency at the wire, and that all your evidence to the contrary was circumstantial, and therefore unworthy of regard. In short, a skepticism like this would open wide the door for the perpetration of all secret crimes, would uproot our faith in man, and destroy even our belief in a Creator and in a future state. These are some of the evils which flow from the declaration of a principle, that we should reject all circumstantial evidence.

There is much more of that with which I could occupy your time in reading, and it illustrates to you forcibly the great standing that that sort of evidence has in the courts of the country, and, I may say, in the estimation of intelligent men, because you act on it, and have to depend on this kind of evidence to satisfy your minds of the great problems of life. You may resort to evidence of this kind to establish a case of this character, for it is one which, above all other cases, must be proven by circumstances, in part, at least. You may have no positive evidence of it. You may take into consideration their association, their relation to each other, their intimacy with each other, their interest in the business transacted, and the results that would flow from the commission of the act.

All of these circumstances and these facts may be taken into consideration. The test as to this character of evidence goes to its character and to its sufficiency. If it is equal in proving power to the testimony of one positive, uncontradicted, credible eyewitness, the law says it is sufficient to establish any proposition. Evidence of any kind, positive or circumstantial, establishing a proposition affecting a crime, is sufficient when it proves it to that extent.

Now, while we are upon this subject, it may be proper to call your attention to the fact, in addition to what I have said, that you may take into consideration the very overt act done, if apparently done in pursuance of the design, to show who was connected with that understanding. You may use that overt act to show the other circumstances. You may use it for that purpose as one item of evidence to show the existence of the conspiracy. As I have remarked, two of the witnesses who were on the stand are confessed accomplices in this alleged crime. They say that they did certain things. If they did, these things would make a conspiracy, and the doing of this particular act charged. If that proposition is true, then you are to inquire whether the other persons charged in the indictment were connected with it. After the first proposition is established, then you must see if the other parties were connected with it. From Pierce, the witness, you have certain facts with reference to George W. Howell that would make him a party to this conspiracy; and if it be true that Jewett was connected with that transaction, that he had knowledge of it, that he permitted it to go on with that knowledge of the offense, with benefits received directly or indirectly as a member of that firm, that would make him a party also. If the other state of the case was true,—that is, that S. R. Howell and Herbert N. Jewett were partners, and George W. Howell, with knowledge and as an agent, was connected with that transaction and assisted in it, that he furnished the means as the agent representing the business of S. R. Howell and Herbert N. Jewett of carrying on the purpose,—that would make him a party in the business also. But I have already adverted to the facts necessary to connect the other Howell with the transaction. Now, these witnesses, Pierce and Mott, occupied a relation to the case different from ordinary witnesses. They confessed they were guilty as charged in the indictment. That would make them responsible under the law. The law lays down a rule on that subject, as to how you should regard testimony of witnesses of that character, and the proposition that the court is asked to give you on that subject by counsel for the defendants is not the law, and the court refuses to give it. The law is different from that, and is contained in the rule which has been laid down by Mr. Justice Dillon in the trial of the case I have already referred you to. That is the case with this man Pierce. That is the case with Mott, and he stands here indicted in five or six cases; but as to whether he is indicted or not, that cuts no figure, except it may prove some one of the propositions that

he is a party to the conspiracy. The rule of law is that accomplices are competent witnesses, and that when sworn you should consider their testimony, for you can convict on their testimony when all the facts and circumstances surrounding the case go to verify their statements. You are to consider their evidence. They are competent witnesses, but under the legislation of congress they may not be compelled to testify. But the testimony of conspirators is always to be received with extreme caution, and weighed and scrutinized with great care, by the jury. It is just and proper for the jury to seek for corroborating facts to bear out their statement. It is just and proper to do it, but it is not absolutely necessary, provided the testimony of the accomplice produces in the minds of the jury full and complete conviction of its truth. Now, there is one point that in my judgment needs elaboration. It is just and proper in such cases for the jury to seek corroborating facts in material respects. You will understand that it is always safest and best to look·for corroborating facts. It is a rule you should always apply, not to take a man's testimony alone in any case, but to look through the whole evidence to see whether there are other facts in the case which corroborate that. And I may say right here, in this connection, that all truths in this world are in harmony; I mean all material or relevant truth. If one witness in a case is telling the truth, there are other propositions, if you can get at them, other truths, that will corroborate what he says; and it is by means of this fact, and of the recognition of the fact, that these other truths frequently consist of circumstances, that we can find the truth in a given case. I say that the testimony of the principal witness upon material facts may be corroborated alone by circumstances, if correctly produced.

Therefore it is prudent, it is safe, it is proper, in a case where a man testifies, to look to other facts corroborating what he says. The testimony of any witness is true if it produces a belief of that character,—if it is equal in proving power to the testimony of one eyewitness; but it is a prudential rule that all witnesses who are confessed accomplices should be corroborated in some material part. It is not necessary to corroborate in every part of the act, in every part of that which goes to make up a crime in every detail, but if he is corroborated in some material fact that is sufficient; that goes to show by the light of other evidence the truth of the statement, and that is what the law means by saying he must be corroborated in some material part. It must, in some particular, tend to show the guilt or innocence of the parties outside of his evidence. That corroboration may come from oral testimony or from documentary evidence, from letters, from writing. It may come from evidence, or letters admitted and found to be competent evidence, but you are to look to it to see that they are corroborating facts in some particular to go to make up the accusation against the parties charged. This is as to the testimony of accomplices. That same witness, Pierce, was sought to be impeached, and his testimony broken down. I give you a rule in this connection that

bears upon the other proposition: If you should believe that he is an accomplice, and that you cannot believe him on that ground, if standing alone; if you believe his testimony is so supported by other facts and circumstances as to impart verity to it, and to make it worthy of belief,—you might believe it on that ground, and you are not at liberty to reject his evidence because he is an accomplice, and you are not to do so until you look through the case to see if his evidence is corroborated. It was sought to be impeached by a number of witnesses; and right here let me say to you that it is a dangerous method of impeachment to the witness and to the cause of justice, and it often works very unjustly against the witness. You, therefore, in ascertaining whether he has been successfully impeached, are to ascertain, first, whether it has been proven in a credible way that the character of that witness as given to you was the character reflected by the opinion of the people generally in the neighborhood where he lives. It frequently happens that we make up our judgments by our own feelings towards the party. There are many men in this world who have such an opinion of themselves that they take their own judgment, and by it compare all other judgments. You say that his reputation is good or bad; but we must consider that reputation as only the reflex of character,—the reflex of the character,—and, in justice to men called into the courts of the country without any idea or intimation of who is going to swear against them, it is for you to see whether that impeachment has been successfully made against the party. There is not a man on earth, if you catch him under certain circumstances, that you cannot find some one to prove that his general character for truth and veracity was bad. Every man who is a man has his enemies, and it frequently happens that men mistake this thing for general reputation. And, again, it opens wide the door of personal prejudice, and it affords means by which men can concoct and do great damage to a witness. It is a means of attack that may be easily resorted to. Then, in ascertaining how far that attack has gone,—and, if made successfully, you have a right to look through all the evidence in this case; if you do not believe the statements of these witnesses reflect the opinions of the people in the community, there is a failure on that ground to impeach; if you do believe that, and they reflect it, then you are to look to other circumstances to see whether really that was the condition as created by the community generally,—you have a right to take into consideration the fact that he was the admitted trusted employe of the defendants; and their evidence fully sustains that fact to such an extent that large sums of money were paid to him, and not a question asked as to how he disposed of it and disbursed it. I say, if he was connected with the business of that company in that way, you have a right to take it into consideration in this case. If the impeachment has been successful, or the reflex of the opinion, the sentiments of the people generally have been placed before you as a jury in this case, and that the witness stands to you in that way, then you are to look to the other

testimony to see whether he is corroborated. If you believe other facts so corroborate his statement as to give verity to it, you may believe him. In a case of that kind you are to say whether his statement is true, to look to all these facts in justice to the defendants and to the witnesses. There are other rules the law gives you for weighing the testimony of witnesses. In addition to the ones already given, you are to take his evidence, the evidence of the accomplice, and see whether there are other facts and circumstances outside of his statement coming from other witnesses corroborating his statement. The same rule applies to the testimony of Pierce and Mott. The rules of law given us say that we are to consider the testimony of each witness as to its consistency, its probability, its reasonableness. If the witness gives you a statement that by your judgment and observation of life seems to be probable, seems to be reasonable when comparing it with what you have observed, seems to be consistent, is not that witness entitled to belief? Then you consider the question as to whether it is borne out by other facts, in the light of the other testimony of the case. The law says that defendants may testify; they have a right to go on the stand and make their statements. You take them as you take the statements of all other witnesses,—for what they are worth. We are all pretty much alike in this matter of self-interest. We need not set ourselves up as standards. The best of men think they should be believed. It comes so near to us that it takes possession of us, this thing of self-interest. The law says that any man can go on the stand and testify. When defendants go on the stand the fact is they have a motive, a consideration. It is a severe test. Some men can stand against it, and follow the line of truth as best they know it, but the law considers that they may not be able to do that; and yet they may be honest men, as the world goes, intentionally honest men, and, for the reason that they may not be able to do it, the law says to you, "You are to consider it in the light of their relation to the case."

You are to do, also, as you do with other witnesses, to see whether it is contradicted by other reliable facts; that, if it is, then it is weakened, as you may attach credit to the contradicting facts; and you are to see to it also whether it is corroborated by other reliable facts, and, if so, it is strengthened. That is the relation the testimony of the defendant witnesses bears to you. Look at its consistency, its reasonableness and probability, in the light of the surrounding circumstances. You may reject it upon the ground that he is a defendant witness, or that he is contradicted by other evidence. You are to take that view of the testimony of all the witnesses, and look for supporting facts. If you believe, when you apply all these rules, that it is entitled to belief, then you are to find it true. Now, to what degree of certainty must this be established? The same degree is required to be established as to other evidence. You cannot demonstrate propositions growing out of human conduct. You can prove them so there is no conjecture to be arrayed

against them. It sometimes is said that nothing can be proven to a degree of certainty when it comes to that which grows' out of human conduct connected with crime, and which is dragged to the light of day by taking the circumstances and actions connected with it. You cannot have it proven absolutely. The law does not ask you to accomplish the impossible. It asks you, as reasonable men, to do that which reasonable, ordinary men would do,— nothing more; nothing less. Where does this rule come from? This rule of law comes from what reasonable men ordinarily do in the every-day affairs of life. It is our own experience, based upon our 'observation of others and our actions. We observe the actions of men, and that the rule existing was ascertained as to the amount of proof necessary to bring belief to the minds of the reasonable men of the country. Evidence was necessary to bring his mind to a conclusion that was reasonable, ascertained by looking at the actions of men in the light of facts proven. Upon that was formulated this rule that the proofs in a criminal case, before conviction can take place by a jury, must be sufficient to establish all the material allegations in the issue beyond a reasonable doubt; so that reasonable men upon a matter of importance or concern would be satisfied of its being true. When it is proven to that extent, it is proven beyond a reasonable doubt. This degree of certainty must exist in this case, and nothing more. The law contemplates it is your moral duty to find this. Now, the counsel for the defendants have called your attention to the question of reasonable doubt in reference to this case. That must be a real and substantial doubt, and not a mere conjecture or surmise as to the possibility of innocence. No other doubt is entitled to a moment's consideration; no other is entitled to occupy your minds for a single second.

Gentlemen, that is the degree of certainty to which this case is required to be established. I believe I have covered every proposition in this case necessary to be given. Gentlemen, in conclusion there is nobody connected with the goverment in this case who wants anything but simple justice, and I speak for myself and the district atttorney when I say that we seek equal and exact justice. Notwithstanding this great cry about the railroad corporations, I ask you to vindicate the law. Railroads are entitled to the same rights as others, but it sometimes looks as if attorneys endeavor to take advantage of a jury. Intelligent men, under their oaths, will administer equal and exact justice in all cases, whether affecting railroads or affecting private citizens. The law ought to be administered, and should be administered, in this way, for the railroad companies have their interests which should be preserved; and it is the object of the law to enforce penalties when statutes or laws are violated, either by the railroad company or private shippers. Gentlemen, you will proceed to make up your verdict.