THOMAS v. UNITED STATES.

TAGGART v. SAME.

(Circuit Court of Appeals, Eighth Circuit. October 21, 1907.)

Nos. 2,485, 2,486.

1. STATUTES—RULES OF CONSTRUCTION—COMPILATIONS.

In cases of doubt and uncertainty as to the meaning of a compiled or revised statute, resort may properly be had to the original enactments.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, § 312.]

2. CONSPIRACY—FEDERAL STATUTE—CONSTRUCTION.

In Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], relating to conspiracies, the words "offenses against the United States" have the same meaning as the words "offenses against the laws of the United States" in the original act of March 2, 1867 (14 Stat. 484, c. 169) the change being merely one of phraseology made by the revision commission, and such section denounces conspiracies to commit offenses created by any of the statutes of the United States.

3. SAME.

A defendant may be prosecuted under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], for a conspiracy to violate a criminal or penal statute of the United States, notwithstanding the fact that the punishment prescribed for the offense created by such statute is less than that prescribed for conspiracy; the conspiracy in itself being a distinct and substantive offense.

4. SAME—CONSPIRACY TO VIOLATE INTERSTATE COMMERCE ACT—GIVING OR RECEIVING REBATES.

A conspiracy to induce the giving or receiving of rebates in violation of the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]), is punishable under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], where the persons charged are not limited to the giver and receiver of the rebate alone.

5. SAME—INDICTMENT—DESCRIPTION OF OFFENSE.

In an indictment under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], for a conspiracy to commit an offense against the United States, all facts necessary to constitute the conspiracy, including the overt act, must be averred with all the particularity required in criminal pleadings, but no high degree of particularity is required in describing the offense to which the conspiracy relates which is necessarily defined by the statute. So, where an indictment charged a conspiracy to induce a shipper to receive rebates from railroad companies in violation of the federal statute, it was not essential to aver the names of such railroad companies which were not known to the grand jury.

6. CRIMINAL LAW—EVIDENCE—ACTS OF CO-CONSPIRATORS.

On the trial of defendants charged with having conspired with a person named and with others to the grand jurors unknown to induce a partnership to accept rebates from railroad companies on shipments in violation of the interstate commerce law, where there was evidence tending to establish the conspiracy, and that the arrangement for the illegal rebates was made between defendants and one member of such partnership, entries in a private memorandum book kept by such partner, showing sums received as "freight commissions" and distributed between the partners individually, which transactions did not appear on the books of the firm, were admissible in evidence.

[Ed. Note.—Admissibility on trial of joint indictments of acts and declarations of conspirators and codefendants after accomplishment of object, see note to Sorenson v. United States, 74 C. C. A. 472.]

156 F.—57

7. SAME—PROOF OF INTENT—SIMILAR TRANSACTIONS.

On such trial also evidence of contemporaneous contracts made by defendants with other large shippers, similar in all respects to that made with the partnership named, and that such shippers also received sums of money indirectly which they understood to come from defendants, and to be in fact rebates, was admissible on the question of intent and motive in the transaction charged in the indictment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 830–834.]

8. CONSPIRACY—ELEMENTS OF OFFENSE.

One who comes into a conspiracy after it has been formed, with knowledge of its existence, and with a purpose of forwarding its designs, is equally as guilty as though he had participated in its original formation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 76.]

9. CRIMINAL LAW—FORMER JEOPARDY—IDENTITY OF OFFENSES.

The acquittal of defendants on one of two indictments consolidated for the purpose of trial is not a bar to a conviction on the other where the offenses charged are distinct in point of law, although the same facts may have been relied on to a great extent in each case.

10. SAME—TRIAL—INSTRUCTIONS.

In a criminal case, the refusal of a requested instruction that defendant is presumed innocent, and that such presumption remains until overcome by the proof, is reversible error, notwithstanding the giving of a proper instruction on the subject of reasonable doubt.

In Error to the District Court of the United States for the Western District of Missouri.

See 145 Fed. 74.

Hale Holden, H. C. Timmonds, and John N. Baldwin (O. M. Spencer, O. H. Dean, and W. D. McLeod, on the brief), for plaintiffs in error.

A. S. Van Valkenburgh, for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. An indictment was found in the court below charging defendants Thomas and Taggart with conspiring with one George A. Barton, a member of the firm of Barton Bros., of Kansas City, Mo., and others to the grand jurors unknown, to commit an offense against the United States by getting that firm, which was engaged in the business of making large shipments of merchandise from New York and New Jersey to Kansas City, Mo., to accept and receive rebates and concessions from divers railroads engaged in transportation of interstate commerce between those places, in violation of the interstate commerce acts, and particularly Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880], known as the "Elkins Act." Another indictment was found in the same court and at the same time against Thomas and Taggart and one Crosby, charging them with conspiring to commit an offense against the United States by getting the Chicago, Burlington & Quincy Railroad Company, a corporation operating a railroad engaged in the transportation of interstate commerce, to offer, grant, and give rebates, concessions, and discriminations to divers favored persons and corporations engaged in interstate commerce, and particularly to such persons or corporations in Kansas City as were engaged in shipping goods from New

York or New Jersey to Kansas City. The two indictments were consolidated for the purpose of a trial. The defendants were found guilty and sentenced to pay a fine and be imprisoned on the first, and with Crosby were found not guilty and discharged on the second, indictment. Thomas and Taggart prosecuted separate writs of error, which were treated together in argument and brief of their respective counsel, and will be treated together in this opinion.

A large number of errors were originally assigned, but in conforming to the requirements of rule 24 of this court (150 Fed. xxxiii), requiring counsel to specify in their briefs the errors intended to be relied upon by them, they are greatly reduced, and will be specifically referred to as the opinion proceeds. Many of the errors claimed to have been committed by the trial court arise under the general specification that the court erred in not sustaining a demurrer to the indictment. Section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676], under which the indictments were found, originated as section 30 of an act entitled "An act to amend existing laws relating to internal revenue and for other purposes," approved March 2, 1867 (14 Stat. 471, 484, c. 169), which is as follows:

"That if two or more persons conspire either to commit any offense against the laws of the United States or to defraud the United States in any manner whatsoever and one or more of said parties to said conspiracy shall do any act to effect the object thereof, the parties to said conspiracy shall be deemed guilty of a misdemeanor, and on conviction thereof shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars and to imprisonment not exceeding two years. * * * "

Under authority of an act approved June 27, 1866 (14 Stat. 74, c. 140), a commission was appointed to revise and consolidate the statute laws of the United States, and empowered to "make such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text." That commission was not authorized to make any changes in the law as it stood, but only to alter the existing text so far as necessary to make clear the intention of Congress whenever that intention was found obscured by contradictions, imperfections, or omissions. The commission reported in 1873, taking the conspiracy provision out of the special class of revenue legislation, and placing it under a heading, "Crimes Against the Operations of the Government," as an independent section (5440) of the Revision. It changed the text so that, instead of reading, "If two or more persons conspire either to commit any offense against the laws of the United States or to defraud the United States in any manner whatsoever" etc., it read:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars and to imprisonment not more than two years."

By an act approved May 17, 1879 (21 Stat. 4, c. 8 [U. S. Comp. St. 1901, p. 3676]), section 5440 was amended so as to provide for a fine of not more than $10,000 or imprisonment for not more than two

years, or both, in the discretion of the court, in lieu of the cumulative punishment provided for in the original section. Except for these modifications of the .punishment section 5440 remains as when first incorporated into the revision as a separate section.

1. It was formerly contended that the statute, by reason of its enactment in and as a part of the revenue act, contemplated only conspiracies against the enforcement of the revenue laws of the United States (United States v. Fehrenbach, 2 Woods 175, Fed. Cas. No. 15,-083), but since the decision of the Supreme Court in United States v. Hirsch, 100 U. S. 33, 36, 25 L. Ed. 539, no such contention can longer be made. Counsel for defendants practically so. concede, but place reliance upon the proposition that the only conspiracies contemplated by the statute are those against the United States as such, which affect the operations of the government or tend to overthrow or impair its authority, and that it does not contemplate a conspiracy to violate simple penal provisions like those of the Elkins act against giving or receiving rebates. The case of Curley v. United States, 64 C. C. A. 369, 130 Fed. 1, is cited and relied upon by them as authority for their contention. That case mainly involves the consideration of a conspiracy to defraud the United States, and many of the expressions quoted and relied upon by counsel must be referred to the conspiracy under actual consideration by the court, namely, a conspiracy to defraud, for an accurate understanding of their meaning. As indicative that the learned court which decided that case did not intend the language to be construed as limiting conspiracies to commit an offense as claimed by the defendants, attention may be called to the following expression found on page 8 of the opinion:

"Manifestly section 5440 in its general terms contemplates wrongs other and beyond conspiracies to commit distinct statutory offenses against the United States. * * *"

If we are wrong in our interpretation of that case, and if it is, when properly understood, authority for defendants' contention now being considered, we find ourselves quite unable to adopt its conclusion. The original conspiracy act of 1867 (14 Stat. 471) made no such limitation. It denounced a conspiracy to commit an offense "against the laws of the United States" as a crime. We cannot presume that the commissioners under the act of 1866 undertook to change the meaning of the original act. They were authorized to make clear the intention of Congress, and they did it in the particular under consideration by expressing the thought that the offense denounced by the original act was one against the organized body capable of being offended, a body authorized to make rules of conduct rather than against the rules themselves. The word "offense" implies a violation of a law by which alone it can be denounced. Actuated doubtless by considerations like these, the commissioners eliminated the words "the laws of," and made the crime denounced to consist of a conspiracy to commit an offense against the United States, the maker of the laws and the body interested in. and responsible for their enforcement, and in so doing they expressed more philosophically and exactly the necessary and essential meaning of the original act. In cases of doubt and uncertainty

about the meaning of a compiled or revised statute, resort may properly be had to the original enactments to ascertain their true meaning. United States v. Bowen, 100 U. S. 508, 513, 25 L. Ed. 631; United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; Logan v. United States, 144 U. S. 263, 302, 12 Sup. Ct. 617, 36 L. Ed. 429; The Conqueror, 166 U. S. 110, 122, 17 Sup. Ct. 510, 41 L. Ed. 937; Barrett v. United States, 169 U. S. 218, 227, 18 Sup. Ct. 327, 42 L. Ed. 723.

A brief reference to other provisions of the statutes shows that Congress frequently employed the formula "offense against the United States," as the equivalent of "offense against the laws of the United States." Section 1014, Rev. St. [U. S. Comp. St. 1901, p. 716], providing for the arrest, imprisonment, and letting to bail of accused persons reads as follows:

"For any crime or offense against the United States the offender may," etc.

. Section 731, relating to the venue in criminal cases, reads:

"When any offense against the United States is begun in one judicial circuit and completed in another it shall be deemed," etc.

Section 5541, relating to the place of imprisonment of convicts, reads:

"In every case where any person convicted of any offense against the United States is sentenced to imprisonment for a period longer than one year, the court by which the sentence is passed," etc.

Section 5542, relating to the same subject, reads:

"In every case where any criminal convicted of any offense against the United States is sentenced to imprisonment and confinement to hard labor it shall be lawful," etc.

Section 5543, relating to the same subject, reads:

"All prisoners who have been or may be convicted of any offense against the laws of the United States * * * shall be entitled," etc.

Many other statutes might be referred to, but the foregoing are sufficient to show that Congress is in the habit of using the formula "offense against the United States" interchangeably and indiscriminately with "offense against the laws of the United States," and that both mean the same thing. It is inconceivable, and, so far as we know, has never been claimed that Congress intended by section 1014 to make provision for the arrest, imprisonment, and bailing of persons charged with offenses affecting the operations of the government only, or that by section 731 Congress did not intend to make all offenses, whatever their grade, begun in one circuit and completed in another triable in either, or that Congress did not intend by sections 5541, 5542, and 5543 to make general provisions for the place of imprisonment and credit for good behavior applicable to all convicts whatever be the character of their offenses.

In the light of the foregoing considerations, we think section 5440 was intended as a broad and comprehensive provision denouncing conspiracies to commit offenses created by any of the statutes of the United States as a crime.

2. Before the passage of the Elkins act in 1903, the interstate commerce law dealt mainly with the carrier, its officers, and agents. The act of 1903 first made it an offense for a shipper to solicit, accept, or receive a rebate, concession, or discrimination. It abolished imprisonment for offenses under the old acts, and did not impose it as punishment for offenses under the new act. In view of this state of the law, it is contended by defendants' counsel that, as the crime of conspiracy under section 5440 is punishable by imprisonment, no such crime can be imputed to one who conspires to violate the interstate commerce act for which no punishment by imprisonment is provided, because that would indirectly operate to subject him to punishment not warranted by law. In other words, that section 5440, in so far as it formerly permitted an indictment for a conspiracy to violate any of the provisions of the interstate commerce act, was to that extent superseded by the Elkins act. This contention might be tenable if the two statutes created or punished the same offense; but the conspiracy statute denounces a crime of different elements and of different gravity than those denounced by either the original or amended interstate commerce acts. In the former, two or more persons must necessarily be implicated, a conspiracy between them must be shown, an overt act in the accomplishment of the object of the conspiracy must be committed, and the offense by reason of the danger that is enhanced by combination and secrecy is peculiarly grave and serious. In the latter acts the mere conscious, intelligent giving, or receiving a rebate, concession, or discrimination and nothing more constitutes a separate offense by the persons so giving or receiving the same. Congress undoubtedly had the power to denounce only the completed act as an offense and to withdraw it from the class of offenses subject to the general conspiracy act, but it would seem, considering the radical difference between a subtantive offense denounced by law and a conspiracy to commit such an offense, that, if Congress had intended that offenses against the interstate commerce act should not continue to be the basis of a conspiracy charge, it would have said so in some clear and unambiguous way, and would not have left a matter so important to the offender and to the government to the uncertain test of repeal by implication. By repeated adjudications of the Supreme Court and other courts a conspiracy to commit a criminal offense has been held to be an entirely different thing from the substantive offense itself, and prosecutions for conspiracies to defeat the provisions of the interstate commerce act have been frequently upheld.

In Clune v. United States, 159 U. S. 590, 595, 16 Sup. Ct. 125, 40 L. Ed. 269, Mr. Justice Brewer speaking for the Supreme Court in expounding the meaning of section 5440 in connection with section 3995, said:

"[It is] contended that a conspiracy to commit an offense cannot be punished more severely than the offense itself, and also that when the principal offense is, in fact, committed, the mere conspiracy is merged in it. The language of the sections is plain, and not open to doubt. A conspiracy to commit an offense is denounced as itself a separate offense and the punishment therefor fixed by the statute, and we know of no lack of power in Congress to thus deal with a conspiracy. Whatever may be thought of the wisdom or pro-

priety of a statute making a conspiracy to do an act punishable more severely than the doing of the act itself, it is a matter to be considered solely by the legislative body. Callan v. Wilson, 127 U. S. 540, 555, 8 Sup. Ct. 1301, 32 L. Ed. 223. The power exists to separate the conspiracy from the act itself and to affix distinct and independent penalties to each."

See, also, United States v. Hirsch, supra; United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 525, 27 L. Ed. 703.

In the following cases persons conspiring to defeat the provisions of the interstate commerce law have been held amenable to the conspiracy statute: Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 730, 19 L. R. A. 387; Waterhouse v. Comer (C. C.) 55 Fed. 149, 19 L. R. A. 403; United States v. Howell (D. C.) 56 Fed. 21; United States v. Cassidy (D. C.) 67 Fed. 698; Wabash R. Co. v. Hannahan (C. C.) 121 Fed. 563. In the light of these authoritative decisions denouncing a conspiracy to commit an offense as peculiarly dangerous and in itself totally separate from those involved in the mere violations of the law and of the other decisions referred to, recognizing violations of the interstate commerce law as bases of charges of conspiracy, it would be highly unreasonable to impute to Congress a purpose not to recognize the doctrine of these cases, and by silence merely to deny the applicability of section 5440 to violations of an important act like the interstate commerce law; and we unhesitatingly conclude that, notwithstanding the offense of violating provisions of the interstate commerce law is punishable with less severity than the conspiracy to commit that offense, section 5440 is in no way repealed or superseded by the provisions of the interstate commerce law in question. The two may well and harmoniously stand together, and in such circumstances repeal by implication or supersession of either cannot be presumed. Great Northern Railway Co. v. United States, 155 Fed. 945.

3. Again, it is argued that an indictment will not lie in this case for a conspiracy because a concert and plurality of agents are necessary elements of the substantive offense for the commission of which a conspiracy is charged to have been formed; and because it required the intelligent co-operation of two or more persons to commit the offense of receiving a rebate, the giver or givers, on the one hand, and the receiver or receivers, on the other, that every element of the offense of conspiracy is involved in the completed offense of receiving a rebate from the one who gave it and is merged in it. Attention is directed to 2 Wharton's Crim. Law, § 1339, United States v. Dietrich (C. C.) 126 Fed. 664, and United States v. New York Cent. & H. R. R. Co. (C. C.) 146 Fed. 298, as authority for the contention. The rule broadly laid down by Wharton if applied as written justifies the contention made. He says:

"When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained." etc.

It is to be noted that the learned author fails to state or make it clearly appear whether he limits immunity from the charge of conspiracy to those who are the sole and necessary actors in the com-

mission of the substantive offense, or whether he includes in his rule of immunity conspiracies against persons who may have conspired to induce others to commit the offense. If he limits the applicability of his doctrine to the former, he would be clearly right. It cannot be if (using one of his illustrations) the crime of bigamy be punishable in a certain way that the two parties who alone could commit it can be subjected to a charge of conspiracy for committing the same crime, and thereby made to suffer twice for exactly the same offense, or be subjected to a severer punishment on a conviction for the conspiracy than is imposed upon the substantive offense itself. But, if persons combine to induce others to commit bigamy, they, according to the same learned author, may be punished as for a conspiracy. We think counsel for defendants have erroneously interpreted Wharton's meaning as manifest from the context. As we understand the Dietrich and the New York Central Railroad Cases, they each involve facts of the kind just referred to in the illustration. In the former case Dietrich alone was to receive a bribe and Fisher alone was to give it to him. The conspiracy charged consisted of the unlawful combination between the two to that effect. The indictment being against those two persons alone was held bad. To show that Judge Van Devanter understood the Wharton rule to be limited to cases in which the necessary parties to the substantive offense only were charged with conspiring, a brief quotation from his opinion will suffice. He said (page 666 of 126 Fed.):

"As the transaction is stated in the indictment, it was Dietrich who agreed to receive the bribe, not Dietrich and Fisher, and it was Fisher who agreed to give the bribe, not Fisher and Dietrich. The charge is not that two or more persons agreed among themselves to corruptly obtain the aid of another, a member of Congress, in securing the appointment of some aspirant to a federal office, nor is it that two or more members of Congress agreed among themselves to obtain from another person a reward or compensation for their services or aid in securing such an appointment. Such an agreement would constitute a conspiracy to commit an offense against the United States, and, if followed by the doing of any act by one of the conspirators to effect its object, would be punishable under section 5440."

In the New York Central Railroad Case the court was dealing with facts like those in the Dietrich Case. The crime charged was a conspiracy to commit the offense of receiving a rebate, and the only persons indicated for the conspiracy were those representing on the one hand the giver and on the other hand the receiver of the rebate, and those were the sole persons whose concert and co-action constituted the substantive offense denounced by the interstate commerce law. That Judge Holt who sat in the case so regarded it a brief extract from his opinion will show. He said (page 304 of 146 Fed.):

"The counsel for the government assert that the Dietrich Case is to be distinguished from this case because in the Dietrich Case but two persons, the giver and taker of the bribe, were charged with the conspiracy in the indictment, while in the case at bar the indictment charges that seven persons named, and others to the jurors unknown, were parties to the conspiracy. But only four of the seven persons named are indicted, and of those four Guilford and Pomeroy represent simply the giver, and Edgar and Earle simply the receiver of the rebate."

The case now before us differs radically from either of the foregoing. Thomas and Taggart, who are the sole defendants and who alone are indicted, were neither givers nor receivers of the unlawful rebates in question. Neither did they stand for them as representatives. They occupied the position of irresponsible intermediaries. They are neither charged nor shown in proof to have given or received the rebate in question, nor are they charged with conspiring to give or receive a rebate. They are charged with conspiring to bring about the commission of the offense of receiving rebates by others, namely, by Barton Bros. If, when the co-action of two or more persons is necessary to constitute the commission of a crime, no outside persons, however effectually and wickedly they may have conspired with them or either of them to bring about the violation of the law, can be held for a conspiracy, immunity from a most salutary criminal provision is found for many of the worst violators of the law. It is the schemers who set afoot the infractions of the law that are most dangerous to the public weal, and we cannot believe that Congress ever intended, except in cases of a clear doubling of punishment of the same persons for the same offense, to relieve them from amenability to the conspiracy statute.

4. The indictment is also assailed (1) for insufficiency in averment of facts constituting the conspiracy; (2) for want of such certainty in describing the offense which the conspiracy was formed to commit as makes it appear that it was an offense against the United States; (3) for want of such certainty in describing the offense as fairly informs the defendants of its nature and of what they were called upon to meet; (4) for duplicity. The indictment charges in clear and unequivocal language that defendants conspired together and with George A. Barton, one of the members of the firm of Barton Bros., of Kansas City, to commit an offense specifically denounced by the interstate commerce law of getting the firm of Barton Bros., who were large shippers of interstate commerce from New York to Kansas City, to accept and receive rebates as defined in that law from railroads over which their freight might be routed from New York to Kansas City. The indictment charges with great particularity the different steps taken in the formation of the conspiracy, and that its object was to bring about the commission of that offense. It is averred that Thomas, who was then operating a transportation bureau in New York City routing shipments and procuring freight rates for those who might employ him (defendant Taggart being in his employ), should first enter into a contract with Barton Bros. securing the right to place or route all their west-bound freight from New York or New Jersey to Kansas City over such railroads as he might select, and should make an arrangement with divers railroad companies engaged in transportation of interstate commerce freight between New York and Kansas City and other railroad companies to the grand jurors unknown for the carriage of their freight from New York to Kansas City, and should secure from such companies, "in the way of pretended claims, commissions, and allowances," large sums of money to be used in part in making payments of rebates to Barton Bros., thereby lessening their freight rate below that es-

tablished and fixed for the time being according to law, and from time to time to pay the same to Barton Bros. as such rebates and concessions. Little, if any, claim is or can be made that the charge of conspiracy is not well and sufficiently laid, but it is urged that the indictment is bad because it does not set out with sufficient clearness the facts constituting the offense to commit which the conspiracy was formed, and particularly that there is no allegation as to what railroad company, if any, was a party to the conspiracy, or that any railroad company had agreed or promised to give Barton Bros. any rebates or that it knew, or understood it had done so. To properly weigh this argument it should be borne in mind that the particular conspiracy charged to have been formed by defendants was to get Barton Bros. to accept and receive rebates, and thereby to violate a criminal statute. The acceptance of secret rebates by one shipper gives him an undue advantage in business and stands in the way of fair, open, and equal competition, which it is the beneficent design of the interstate commerce act to promote. The conspiracy under consideration was to defeat that design by getting Barton Bros. to receive rebates, and not by getting carriers to give them. But it is said that the receipt of a rebate necessarily implies a giver, and that to properly advise the defendants of the crime charged against them the name of the proposed giver should have been stated and the fact made to appear that they were to act knowingly and intentionally in doing so. In other words, the contention is that facts should be averred with such accuracy as would show, not only an intention to commit the substantive crime, but all facts necessary to constitute that crime. We think that is not the law. All facts necessary to constitute the conspiracy, including the overt act, must be averred with all the particularity required in criminal pleadings because the conspiracy is the crime with which the defendants stand charged, and with the nature and character of which they, under constitutional safeguard, are entitled to be advised. But, when the conspiracy charged is one to commit an offense, and that offense (as is the case in all offenses against the United States) is clearly defined by statute, no high degree of particularity is required in describing it. If enough is shown to make it appear that an offense against the United States has been committed, it is sufficient.

Wharton says (2 Wharton's Crim. Law, § 1343):

"It is enough to set out the offense aimed at by such apt words as will describe it as a conclusion of law."

In State v. Ripley, 31 Me. 386, it is said:

"In an indictment for a conspiracy at common law, if the conspiracy charged is an unlawful combination and agreement of two or more persons to commit a deed which if done would be an offense well known and acknowledged, the nature of which is perfectly understood by the name by which it is designated, no further description of the crime is required."

In State v. Noyes, 25 Vt. 415, it is held:

"As the object of the conspiracy was to commit an offense punishable by law, it was not necessary to set out the means to be used to effect it; and it is not necessary that there should be the same certainty in setting out the

object of the conspiracy as there must be in an indictment for the offense which the respondents conspired to commit."

In State v. Grant, 86 Iowa, 216, 53 N. W. 120, the Supreme Court of Iowa uses the following language:

"It is said that the indictment is defective, in that it fails to fully disclose the means by which the crime was to be accomplished. It is well settled in this state, and is the law in many states, that, where the indictment charges a conspiracy to do an act which is a crime, it is sufficient if it be described by the proper name or terms by which it is generally known in law. It is only where the charge is that an act in itself not criminal is sought to be accomplished in an illegal manner, or by illegal means, that the means used for its accomplishment must be averred."

In Ching v. United States, 55 C. C. A. 304, 118 Fed. 538, 540, the Circuit Court of Appeals for the Fourth Circuit in discussing this subject said:

"As to the sufficiency of the indictment, it must be first noted that the gist of the offense charged is that of conspiracy, which we think is properly pleaded. In such cases the offense which is intended to be committed as the result of the conspiracy need not be described as fully as would be required in an indictment in which such matter was charged as a substantive crime."

See, also, United States v. Stevens (D. C.) 44 Fed. 132, 141.

Measured by these rules of pleading, the indictment abundantly shows that the conspiracy had for its object the commission of a well-known criminal offense against the United States; that, in the absence of definite knowledge, a sufficient description of the railroads which were to be involved in the execution of the conspiracy is given, and that the defendants were sufficiently informed of the nature and character of the offense with which they were charged. The offense was one clearly denounced in the Elkins act, and sufficiently described in the indictment. The railroads involved were not known to the grand jury, but were described as those which, with their connecting lines, were engaged in carrying interstate commerce from New York to Kansas City, and were the ones which defendants were to designate and determine by exercising the power given them by Barton Bros. to route their freight. Besides definitely averring that the conspiracy was to bring about the commission of a well-known criminal offense, the indictment adds by way of showing more particularly the nature and character of the offense, and the means to be resorted to for its commission, that the money was to be demanded, solicited, and received from the railroads so to be determined by the defendants "in the way or guise of pretended claims, commissions, and allowances," and, when so received, was to be paid over to Barton Bros. as rebates. The words just quoted found in the indictment are general, but, if they "make clear to common understanding" the matter to which they refer, it is sufficient. Evans v. United States, 153 U. S. 584, 592, 14 Sup. Ct. 934, 38 L. Ed. 830. To get money from the railroads "in the way or in the guise of pretended claims, commissions and allowances" plainly suggests to the "common understanding" that some subterfuge was to be practiced not to get the money, but to make the money apparently appropriated for one purpose intentionally serve another.

In the recent case of Armour Packing Co. v. United States (C. C. A.) 153 Fed. 1, we held, that:

"The substance of the crime of receiving a rebate or concession under the Elkins act is the solicitation, acceptance, or receipt thereof whereby property in interstate or foreign commerce is transported at less than the regular rate. The device whereby the receipt and transportation are obtained is not an essential element of the crime and it is unnecessary to plead it in the indictment."

Much more is it true that in a charge of conspiracy to bring about the receipt of a rebate or concession the particular device or method by which it is to be accomplished need not be pleaded with all the particularity which would be required in pleading the commission of the substantive offense.

The contention that the indictment is bad for duplicity because it contains the charge that defendants conspired to commit the offense of getting Barton Bros. *"to accept and receive"* rebates, etc., is without merit. The words underscored are obviously used to express one and the same act, and the fact that the pleader employed them conjointly is not objectionable. It results that the various objections to the indictment for insufficiency are not well taken.

5. Was there error in the introduction of evidence? Without intending to deal with the facts in detail or to make a demonstration from the record of what we have concluded, we content ourselves by stating the result of a patient and careful examination of all the proof. It is the theory of the government, and there is ample evidence tending to show, that some time before November 14, 1903, Thomas, who resided in New York, went to Kansas City and there made arrangements orally with Kimber L. Barton, senior member of the firm of Barton Bros., for the purpose, which subsequent evidence tended to show, of securing rebates from the fixed and lawful tariff rates from New York to Kansas City for Barton Bros., and after securing them to pay the same over to Barton Bros. as unlawful concessions in their favor.

The others members of the firm, William and George A. Barton, if not shown to have been actually cognizant of the arrangement made by Kimber L. at the time it was made, afterwards knowingly participated in the fruits of that arrangement, and fully ratified all that was done by the senior member. On November 14th a contract was executed between Thomas and Barton Bros. This was fair and lawful on its face. It purported to obligate Barton Bros. to give Thomas the exclusive right to route all of their west-bound freight from New York, and to give him a certain minimum amount for his services in so doing, and obligated Thomas, among other things, to collect from the carrier any claims for loss and damage to merchandise and overcharges which Barton Bros. might have. The term of this contract was to expire in January, 1905, and on January 10th of that year another formal contract purporting to obligate the parties to the performance of the same obligations for another year was executed between them. There is evidence tending to show that these contracts did not express the real purpose of the parties, but were subterfuges intended by them to conceal and mystify their real purpose, and to make evi-

dence against the time of possible need. The then recent enactment of the Elkins law, approved February 19, 1903 (32 Stat. 847, c. 708), had for the first time made the receiving of rebates by a shipper a criminal act, and had rendered any direct contract between the carrier and shipper providing for the giving or receiving of an unlawful rebate exceedingly hazardous. Hence the occasion and supposed prudence of operating, if at all, through the medium of an intermediary who should be neither carrier nor shipper, nor subject to the penalties for the misdeeds of either under the interstate commerce law.

With the foregoing scheme claimed by the government to have existed between Thomas and Barton Bros. in mind, we proceed to a consideration of the errors assigned in the introduction of evidence. During the two years in question the firm of Barton Bros. received from the carriers at the hands of Thomas about $3,900 on legitimate claims for loss, damage, and overcharge, and in addition the individual members received each one-third of $10,300 from some source and on some account. These facts are undisputed. With a view of getting at the source of and reason for these individual receipts, George A. Barton, one of the partners, who was called as a witness by the government, was asked whether any of this money came from Thomas. He answered "No." He was then asked if it was received from anybody else acting for Thomas. After objections and rulings by the court, the witness answered and the testimony proceeded as follows:

"A. Our firm has received money from sources. Shall I state from whom?
"Q. Certainly. A. I think we received remittances from Mr. Kelby. [Kelby was clerk for Thomas.]
"Q. Do you mean by his hand or through him? A. We received remittances by express and through the mail, and I think Mr. Kelby was here once and left a draft. * * *
"Q. Now, what were those remittances? In what form and in what amount and on what dates? A. Well, I have a record book made up by K. L. Barton of our firm, memoranda that he handed to me. They are not on our regular books. * * *
"Q. Have you that record with you? A. Yes, sir.
"Q. You may state what that book shows with reference to these payments."

To this question the defendants objected, and, upon the objection being overruled, duly excepted. The contents of the book read in evidence showed that from time to time during the year 1904 amounts were received under a notation of "freight commissions" aggregating about $8,000 and in the year 1905 aggregating about $2,300. The proof showed that the money so entered in the private book by the senior member of the firm was equally divided between the three members, Kimber, George, and William, and that the amounts so received and divided did not include the legitimate amounts received by the firm for loss, damage, and overcharge which were regularly entered on the books of the firm. We think the court committed no error in receiving in evidence the contents of this private book. Sufficient evidence had already been introduced, to say nothing of evidence afterwards offered, to make a prima facie case of the conspiracy charged—evidence sufficient when considered with all the inferences naturally deducible from it to justify a finding by the jury that the conspiracy as charged had been entered into. Kimber L. Barton was its moving

spirit. He made the preliminary arrangements and collected the unlawful proceeds. Although he was not expressly charged in the indictment as one of the conspirators, he falls well within the class of those "to the grand jurors unknown" who are so charged. He was engaged with Thomas and his copartners in the unlawful purpose, and his acts in furtherance of it, including the fact that he received the moneys, entered the same in a private book, and not in the regular books of the firm, and afterwards distributed them between the members of his firm, were clearly admissible against the defendants, his co-conspirators. We are not unmindful of the contention of defendants' counsel that there was no direct evidence of any unlawful undertaking with Thomas, and no direct evidence that Thomas paid Barton Bros. any money as rebates or concessions on freight charges. For argument's sake, this might be conceded. Conspirators do not act that way. Fraud is not often proven by direct testimony. A preconcerted plan to do an unlawful act must from the nature of the case be usually established by inferences drawn from the relation of the parties from the acts done and from the results achieved.

"It is not necessary to constitute a conspiracy that two or more persons should meet together and enter into an explicit or formal agreement for an unlawful scheme. * * * It is sufficient if two or more persons in any manner or through any contrivance positively or tacitly come to a mutual understanding to accomplish a common and unlawful design." United States v. Babcock, 3 Dillon, 581, 585, Fed. Cas. No. 14,487.

"If the evidence shows a detail of facts and circumstances in which the alleged conspirators are involved, separately or collectively, and which are clearly referable to a preconcert of the actors and there is a moral probability that they would not have occurred as they did without such preconcert, that is sufficient if it satisfies the jury of the conspiracy beyond a reasonable doubt." Davis v. United States, 46 C. C. A. 619, 107 Fed. 753, 755.

"It is often that the intentions of a wrongdoer are ascertained entirely by acts done which are the natural effects of unlawful designs. The acts and circumstances which accompany them showing the connection between the acts, and the motives which produced them, are generally the mosts convincing evidence which can be adduced." State v. Ripley, 31 Me. 386, 388.

Looking at the proof in the light of the foregoing well-understood rules, we entertain no doubt that the money which Kimber L. Barton received, entered in his book, and subsequently divided equally between his other partners and himself came from Thomas; that Thomas got the same from the railroad which carried Barton Bros.' freight through the colorable pretense of collecting exaggerated claims for loss, damage, and overcharge or commissions, and that all these things are clearly referable to a prearrangement to that end entered into between Thomas and the members of the firm and others. If there were any doubt about the unlawful intent of the defendants in their business relations with Barton Bros., that doubt is dispelled by the evidence of contemporaneous contracts and transactions made by

Thomas with other merchants doing business in St. Louis, Kansas City, and Omaha. Those contracts were all equally fair and innocent on their face, calling for actual service by Thomas in the way of routing the shippers' freight, prosecuting, and collecting claims for loss, damages, and overcharges, but the merchants, by their evidence, disclose the unreality or comparative unimportance of any such service. One admitted that as a result of his firm's contracts with Thomas they expected to get a cheaper rate than the usual shipper. Another said it was "inferred without discussion that his house was to get certain money * * * that Thomas understood very well that I understood," and, again, that "the results were beneficial to us * * * in the sense of refunds which we were to receive." Another testified that Thomas "was to look after all the claims we had for freight, and we were to receive a certain rebate on freights from west of the Mississippi river." Notwithstanding the explicit provision in the contracts that Thomas should attend to claims for loss, damage, and overcharge, some of the shippers testified that they took care of them and handled them for themselves without the intervention of Thomas. The evidence of all of them shows that the feature requiring Thomas to attend to their claims for loss, damage, and overcharge was treated with much indifference. Their testimony discloses, when read with discrimination and fair regard to the circumstances, that the real purpose of all of them in making contracts with Thomas was to secure rebates or refunds from the railroads on freight charges. In fact, they did receive money as a result of their arrangement. It came mysteriously to them, generally from unknown sources, sometimes by special messenger, sometimes by express, sometimes by deposit in bank to the credit of a fictitious name agreed upon, and always in currency. When received it was charged to some individual account out of the regular course of bookkeeping. It was obviously intended that the money received by them should not be traceable to any source. Tracks were covered as well as they could be, but the humiliating confession had to be made, and was made by some, that their real purpose was to secure unlawful rebates, and others are left by the proof in the uncomfortable attitude of receiving large sums of money in currency without knowing or inquiring whence it came or on what account it was paid to them. The conduct of the latter is consistent alone with the fact that they thought they were receiving money unlawfully, and all the circumstances point with much certainty to the conclusion that they actually received unlawful rebates or concessions on freight shipments as an intentional result of the contracts made between them and Thomas.

Objection was made to the introduction of evidence showing dealings between Thomas and the merchants other than Barton Bros., and the action of the court in admitting that evidence is assigned for error. There is no merit in that assignment. Nothing is better settled in the law of evidence in any case involving fraudulent intent than that other acts and dealings of the accused of a kindred character to those charged in the case in hand and performed at or about the same time are admissible to illustrate and establish the intent or motive in the particular act directly in judgment. Wood v. United

States, 16 Pet. 342, 10 L. Ed. 987; Chitwood v. United States (C. C. A.) 153 Fed. 551; Exchange Bank v. Moss, 79 C. C. A. 278, 149 Fed. 340. The present case fitly illustrates the value of the rule in question. The same ostensible contracts, the same mystery, the same results appear in all the collateral transactions. They tell the same story of an attempted evasion of the law under the thin disguise of a formally executed contract and afford very persuasive evidence of the real intent and purpose of the accused in similar dealings with Barton Bros. in this case.

6. The contention is made that the evidence fails to disclose the formation of a conspiracy within the jurisdiction of the court below. This position under the proof to which attention has already been sufficiently called cannot be sustained. The fraudulent scheme seems to have been first devised and agreed upon in Kansas City, and it makes little difference where the misleading and deceptive formal contracts were executed. They were merely a step taken in carrying out the scheme and designed doubtless to make it more effectual.

7. It is earnestly contended·that there was not sufficient evidence to connect defendant Taggart with the particular conspiracy charged in the indictment. While the proof does not connect him with the incipiency of that conspiracy, it is claimed by the government that facts appear from which it may be reasonably inferred that he came into it after it was concocted with full knowledge of its existence and character and with a purpose of furthering its design. If such are the facts,. he was as much a conspirator as if he participated in its original formation. United States v. Newton (D. C.) 52 Fed. 280; United States v. Barrett (C. C.) 65 Fed. 62; United States v. Cassidy (D. C.) 67 Fed. 698. This contention presents a doubtful question of fact, and as the case, for reasons hereafter stated, must be remanded for another trial when new evidence may be presented on the issue, it is not deemed necessary or wise to further consider it at the present time.

8. Because of the verdict of not guilty and the judgment discharging the defendants Thomas, Taggart, and Crosby on the indictment against them which was consolidated with the present indictment against Thomas and Taggart for trial, the last-named defendants interposed a plea of former jeopardy as a bar to their conviction in the present case. This plea was disallowed, and defendants assigned that action of the court as error. A brief reference to the facts will dispose of the question. The indictment against defendants and Crosby was for a conspiracy to get the Chicago, Burlington & Quincy Railway Company to give rebates to divers shippers in Kansas City. The indictment against the defendants in this case (not including Crosby) was for a conspiracy to get Barton Bros. to receive rebates from divers railroads. Notwithstanding the similarity of evidence introduced in support and defense of the two prosecutions, the offenses charged in the two indictments were totally different as a matter of law. They were grounded on different provisions of the interstate commerce act of 1903, and the acquittal in one affords no ground for discharge in the other. There had been no jeopardy on the charge contained in the present indictment. "A plea of autrefois acquit"

must be upon a prosecution for the same identical offense. 4 Bl. 336. It must appear that the offense charged, using the words of Chief Justice Shaw, was the same in law and in fact. The plea will be vicious if the offenses charged in the two indictments be perfectly distinct in point of law, however nearly they may be connected in point of fact. Burton v. United States, 202 U. S. 344, 378, 26 Sup. Ct. 688, 50 L. Ed. 1057.

Other criticisms are made of the proceedings below, and error is claimed to have been committed in the charge to the jury and in refusing to give certain declarations of law requested by defendants, but, in view of the conclusions already reached and expressed on fundamental and important questions, it is not deemed necessary for the guidance of the trial court at the next trial to express our opinion on the several incidental and less important questions presented by the assignment of errors. Most of them are answered by the proper application of the principles already laid down.

As we have already indicated, the judgment must be reversed, and we will now proceed to a consideration of one error which renders that result inevitable. The court was duly and properly asked to instruct the jury that the defendants were presumed to be innocent of the crime charged against them, and that such presumption remained with them until it was overcome by the proof. This instruction the court refused to give and exception was duly saved. It is not claimed that the request was improper, or that it should not have been given, but it is claimed that its equivalent was given to the jury in the general charge. We have critically examined the charge with a view of extracting from it, if possible, some equivalent for the instruction asked and refused, but we fail to find it. All that counsel for the government point out and claim to be such equivalent is the repeated declaration found in the general charge that the jury must find the defendant guilty beyond a reasonable doubt before a verdict of guilty can be rendered. It is earnestly contended that such instruction is the full equivalent of the one asked and refused. However interesting an original discussion of this question might be, it is not open to us. The Supreme Court has conclusively settled it. In the two cases of Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481, and Cochran & Sayre v. United States, 157 U. S. 286, 299, 15 Sup. Ct. 628, 39 L. Ed. 704, that court has unequivocally held that a proper instruction concerning the subject of reasonable doubt was not the equivalent of an instruction concerning the presumption of innocence, and judgments of conviction in both of those cases were reversed because of refusal to give a requested instruction upon defendant's presumption of innocence like that asked in this case, notwithstanding the fact that in each the trial court properly instructed on the subject of reasonable doubt.

On the authority of those cases, we have no alternative but to reverse the judgments, and remand the causes to the court below for a new trial; and it is so ordered.

SANBORN, Circuit Judge (concurring). I concur in the reversal of the judgments in these cases for the reason stated in the foregoing

opinion, and also because it seems to me that the testimony of George A. Barton to the contents of the record book, or of the memoranda, which he swore that Kimber L. Barton kept of the moneys received for Barton Bros., was hearsay evidence, and its reception fatal error. Conceding that Kimber L. Barton was a co-conspirator with the defendants below, and that his overt acts in the execution of the conspiracy were admissible against them, the proof of those overt acts was still subject to the established rules of evidence. Whether or not he or his firm received the sums of money which George A. Barton read from that book from the defendants, or either of them, whether or not he correctly entered in that book what he or his firm received, were questions of fact which were decisive in the trial of this action. If George A. Barton had testified that Kimber L. Barton had told him that Kimber, or his firm, had received the moneys entered in that book, that testimony would have been hearsay. The mere fact that those amounts were written in the book by a person other than the witness does not change their character. Written hearsay is not more competent than oral hearsay. Before the contents of that book could become admissible evidence against the defendants, competent proof that the moneys there entered were received from the defendants, or one of them, and that Kimber L. Barton correctly wrote down in that book the amounts which he, or his firm, so received, was indispensable. Even if the concession were made, and it is not, that Kimber's statements were admissions of all the conspirators, and hence of the defendants, still the book was incompetent because there was no evidence in the case that Kimber ever said or admitted that he had correctly entered in the book, or in the memoranda, the amount of moneys which he, or his firm, had received, and George A. Barton did not testify that those moneys were correctly entered. The fact is, however, that those entries were not acts in execution of the conspiracy. The making of those entries did nothing toward the accomplishment of the purpose of the conspiracy. This purpose either had or had not been accomplished before the entries were made, hence these entries were not admissible, either as overt acts, or admissions of a conspirator, nor as independent testimony of verified writings. They were nothing but the unverified, and hence incompetent evidence of that which Kimber L. Barton happened to write.

The chief reason for the rule which excludes hearsay testimony is that its obedience subjects, while its disregard relieves, the parties whose statements are offered, from the cross-examination of opposing parties. The right of cross-examination is the great safeguard against fraud, false statements, and half truths resulting from statements of parts and omissions of other parts of conversations and transactions, which are frequently more misleading and dangerous than direct falsehoods. It furnishes the cardinal and most effective means to discover and disclose the whole truth in all judicial investigations, and, under the English and American systems of jurisprudence, the opportunity to exercise the right of cross-examination is a condition precedent to the reception of the direct evidence of the witness. Heath v. Waters, 40 Mich. 457, 471; Sperry v. Moore's Estate, 42 Mich. 353, 361, 4

N. W. 13. If the unsworn written statements of witnesses may be received in evidence upon the testimony of a third party that the witnesses told him they were true, then the witnesses who know the facts may make their written statements thereof, and tell one who knows them not that those statements are true, and the accused may be deprived of the privilege of being confronted by, and of all opportunity to cross-examine, the real witnesses against him, for, as in the case at bar, they may be conveniently absent and the witness who produces their written statements may know nothing, but that they told him they were true.

No rule of law is more salutary, or more indispensable to the security of the life, liberty, and property of the citizen, than that which prohibits the repetition of the written or oral statements of absent persons to determine issues between litigants, and commands that only after due notice, after opportunity for cross-examination of the very parties whose statements are offered, and then only under the solemnity of an oath or affirmation shall their stories be evidence. Disregard this rule, and the most sacred rights of persons and property are at the mercy of the whimsical and pernicious gossip of the reckless, the irresponsible, and the vicious. Mima Queen, etc., v. Hepburn, 7 Cranch, 290, 295, 3 L. Ed. 348; Board of Com'rs v. Keene Five Cents Sav. Bank, 47 C. C. A. 464, 470, 108 Fed. 505, 510; Resurrection Gold Min. Co. v. Fortune Gold Min. Co., 64 C. C. A. 180, 186, 188, 129 Fed. 668, 674, 676; National Masonic Acc. Ass'n, etc., v. Shryock, 20 C. C. A. 3, 7, 73 Fed. 774, 777. In the case in hand one of the most important, if not the most important, fact in issue was permitted to be proved to the jury by the unverified written statement of one who was either a stranger or a criminal and who was permitted to be absent from the trial, so that the defendants were deprived of all opportunity to cross-examine him on this crucial question, and of the right to be confronted with one of the principal witnesses against them. A conviction in this case ought never to be permitted to stand upon such evidence.

The other questions discussed in the opinion of the majority are not determinative of the case as it is now presented to this court, and I do not desire to be deemed to have expressed any opinion upon them.